UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-CR-20267-WILLIAMS

UNITED STATES OF AMERICA,

v.

ARIEL NUNEZ FINALET,

       Defendant.
_____/

### UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through the undersigned counsel, files this sentencing memorandum in support of a high-end Guidelines sentence of 41 months' imprisonment for a defendant who (1) was a fugitive abroad for years; (2) served an integral role at multiple fraudulent pharmacies in this wide-ranging, years-long conspiracy; and (3) is now taking advantage of more lenient Sentencing Guidelines than those faced by his codefendants who accepted responsibility and never fled.  41 months is sufficient, but certainly not greater than necessary to comply with the purposes of sentencing under 18 U.S.C. § 3553(a)(2).

I.  **BACKGROUND**

On April 21, 2016, a federal grand jury sitting in the Southern District of Florida returned an Indictment charging the defendant with conspiracy to commit health care and wire fraud, in violation of 18 U.S.C. § 1349.  The Indictment stemmed from the defendant's participation in a years-long conspiracy, with over a dozen others, concerning a network of pharmacies that submitted more than 16 million dollars in successful, fraudulent claims to Medicare for medications that were medically unnecessary and not provided to patients.  PSI ¶¶ 7, 43, 174. Specifically, the defendant was the legal owner and registered agent of Lily and Rosy Pharmacy, cashing checks and withdrawing cash—typically just below the legal reporting limit of $10,000—

to provide patient recruiters with the funds they needed for illegal kickbacks. PSI ¶ 54. Those kickback were used to obtain the Medicare beneficiary information necessary for coconspirators to submit fraudulent claims. PSI ¶¶ 54–57. The defendant's involvement in the scheme was far from limited to Lily and Rosy—he worked at Azul Pharmacy, Lola Pharmacy, S.P. Pharmacy Corp., Healing at Hand, Inc., and Lucky RX Pharmacy. PSI ¶¶ 55–60. Between two of those pharmacies alone, Lily and Rosy and Azul, the defendant caused over $1.9 million in fraudulent claims for prescription drugs, of which the Government was able to trace over $500,000 to the defendant personally. PSI ¶ 61.

By the time the defendant was indicted for his crimes, he had already fled to Cuba through Mexico by paying for fake Mexican citizenship papers. *See* PSI ¶ 108; DE 604.[1] According to translated Cuban court records provided by defense counsel, the defendant began laundering Medicare fraud proceeds into Cuba as early as 2015. *See* Ex. 1 at 10; PSI ¶ 159.[2] Over the next two years, the defendant used those proceeds to vacation to Russia and buy luxury cars and properties in Cuba, where he lived an "ostentatious lifestyle." Ex. 1 at 10–12. On July 4, 2017, Cuban intelligence authorities arrested the defendant for money laundering based on those luxury purchases and the defendant's financial transactions, which he arranged to disguise his ownership interest and conceal the illicit origin of funds. *See id.* at 12–17. Cuban authorities had learned about the defendant's underlying health care fraud and the Medicare proceeds from Interpol's

---

[1] The Government does not oppose the defendant's four factual objections, in large part because of the inability to confirm the defendant's whereabouts abroad for the years he was avoiding United States prosecution, including the great difficulty in relying upon Cuban court records. *See* DE 604. In that respect, the Government takes issue with the defense's characterization of his background and detention prior to his 2023 arrest as a fugitive in Spain, which this Memorandum will address further below. *See id.* at 3.

[2] Exhibit 1 was provided by counsel for the defendant. The Government has been unable to independently verify the accuracy of these Cuban Court records due to the lack of diplomatic relations between the United States and Cuba, despite attempts by the Department of Justice's Office of International Affairs.

March 2017 red notice for the defendant's arrest based on the Indictment in this case. *See id.* at 12. Cuban authorities detained the defendant from July 4, 2017, until August 31, 2018, when after being found guilty of money laundering at trial, the defendant was sentenced to eight years' imprisonment. *See id.* at 4. That sentence was reduced to probation on February 26, 2021. *See id.* at 7. In October 2022, the defendant moved with his family to Mexico, and the following year they traveled to Spain, which is where the defendant was arrested on the red notice for the instant case. PSI ¶ 159. The defendant was held pending extradition in Spain from March 21, 2023, through November 21, 2023, when he arrived in the Southern District of Florida for his initial appearance. *Id.*

Four of the defendants' indicted coconspirators in this case remain fugitives of justice: the two leaders of the conspiracy, Pedro Torres and Antonio Hevia, as well as Dora Robaina and Mario Saul Lay. *See* PSI at 3; PSI ¶ 110.

## II.   ARGUMENT

### A.   The Defendant's Flight to Cuba to Evade Prosecution

As the Court is well aware, health care fraud is sadly endemic to South Florida. Many of those fraudsters are Cuban nationals who flee to Cuba—including this defendant and two fugitive leaders of this conspiracy—and rarely are those fugitives held accountable for their crimes. After all, with the short boat ride to Cuba, individuals can rack up millions of dollars in fraudulent claims to Medicare or private insurance. As soon as they get word of payment suspension or a federal investigation, within a few hours they can take their proceeds offshore, protected from extradition to the United States due to the lack of diplomatic relations with Cuba. The defendant here made that exact choice. After the Medicare money stopped flowing in 2015, the defendant gambled that he could live like a king in Cuba without accepting responsibility for his crimes, unlike around a dozen of his codefendants that the Court sentenced since 2016. *See* PSI at 2–3.

That gamble failed. Cuban authorities got wind of the defendant's involvement when Interpol published a red notice for the defendant's arrest, and authorities subsequently uncovered the defendant's scheme to launder funds through various luxury transactions in Cuba. As a result, the defendant served approximately three and a half years total in Cuban custody, after which he flew to a country that does have diplomatic relations with the United States—hence his extradition to the Southern District of Florida. And now that the defendant is about to be sentenced and seeking a downward variance of one year and a day in prison, he is effectively asking the Court to give him credit for the time he served in Cuba on a different crime of money laundering. *See* DE 606 at 2. Doing so would not only bail the defendant out of his bad bet, it would send a clear message to fugitives in Cuba—those in this case who remain abroad and in other cases—as well as other fraudsters in Miami who are weighing whether to face the music in the United States or boat over to Cuba with fraud proceeds. The message is this: "Flee. Flee because you can live a luxurious life in Cuba, and even if you do get caught, any time you serve there will be credited on your United States sentence if you are ever extradited."

That message would be awful for the criminal justice system. Rewarding fugitives undermines "respect for the law," provides "[un]just punishment for the offense," and ignores the need for both specific and general "deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A)–(B). For that reason, courts have long recognized that "an absconder" should not be "reward[ed] . . . for his conduct," and "defendants are not generally credited for misdeeds." *United States v. Talley*, 83 F.4th 1296, 1302 (11th Cir. 2023) (quoting *United States v. Buchanan*, 638 F.3d 448, 455 (4th Cir. 2011); *United States v. Island*, 916 F.3d 249, 253 (3d Cir. 2019)); *see United States v. Johnson*, 550 F. App'x 766, 771 (11th Cir. 2013) (affirming sentence where district court found that a defendant "did not provide a satisfactory explanation for why he then remained a fugitive for almost three years and appeared to have no intention of turning himself in when he was caught

4

by authorities"); *United States v. Zavala*, 300 F. App'x 792, 795 (11th Cir. 2008) (justifying a higher sentence for defendants who were "fugitives from justice").

Not only should the Court refuse the defendant credit for his time in Cuban prison under the Section 3553(a) factors, it lacks power to do so as credit for time served under 18 U.S.C. § 3585(b). Section 3585(b)(2) essentially prohibits double-counting prison time toward two different sentences; it only provides credit for "time . . . spent in official detention prior to the date the sentence commences . . . as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed[] *that has not been credited against another sentence*." Because the defendant received credit toward his Cuban sentence for the entire period of July 4, 2017, through February 26, 2021 (including the pretrial detention period from 2017 through August 31, 2018), that time cannot be credited under Section 3585(b) toward his United States sentence.[3] Consider the identical circumstances in *Garcia v. Stone*:

> Petitioner seeks federal credit for time previously credited to his sentence imposed by Cuban authorities because he became aware of the charges pending against him in the Southern District of Florida while still incarcerated on the Cuban sentence. However, to award the requested credit would violate the tenets of § 3585(b) as described above because it would result double in credit, as the period of November 5, 2012, to September 24, 2015, was already credited against Petitioner's Cuban prison sentence.

No. 3:18-cv-042, 2018 WL 4441536 (S.D. Ga. Aug. 22, 2018), *report and recommendation adopted*, 2018 WL 4431329 (S.D. Ga. Sept. 17, 2018).

---

[3] The Cuban court records the defendant provided make clear that he received credit not only for the time served in prison post-sentencing, but before sentencing from July 4, 2017, through August 31, 2018. The records refer to the defendant's sentence beginning "on 8-31-2018, . . . having served 1 year and 58 days of his punishment" already toward his "8 years of confinement." Ex. 1 at 4. "1 year and 58 days" prior to August 31, 2018, was July 4, 2017, the day of the defendant's arrest in Cuba.

5

Instead of crediting the defendant's flight from prosecution, the Court should sentence him at the high end of the Guidelines and send the message that there are repercussions for fleeing from authorities and for committing health care fraud.

### B.     The Defendant's Integral Role in the Fraud

The defendant's sentencing memorandum casts him as a mere "nominee owner" who was directed by others to commit fraud for a "couple of months." DE 606 at 2, 5. That could not be further from the truth. The defendant played an integral role in a conspiracy to defraud millions of dollars from Medicare that lasted for years, from "in or around January 2011 . . . through in or around September 2014." DE 602. During that time, as the legal owner of Lily and Rosy Pharmacy, the defendant cashed countless checks and made regular trips to withdraw cash from the bank to pay patient recruiters to keep the fraud machine going. PSI ¶¶ 41, 54. He also furthered the fraud at five other pharmacies that were part of the conspiracy, including Azul Pharmacy. PSI ¶¶ 55–60. Between two of those pharmacies alone, Lily and Rosy and Azul, the defendant caused over $1.9 million in fraudulent claims for prescription drugs, of which the defendant personally obtained over $500,000. PSI ¶ 61. Accordingly, "the nature and circumstances of the offense" and "the seriousness of the offense" also warrant a high-end Guidelines sentence. 18 U.S.C. § 3553(a)(1) and (a)(2)(A).

### C.     Avoiding Unwarranted Sentencing Disparities

A sentence any lower than the high end of the defendant's Guidelines would cause two types of unwarranted sentencing disparities with similarly situated defendants. *Id.* § 3553(a)(6). First, the defendant's current Guidelines benefit substantially from the two-point offense level reduction under Guidelines Section 4C1.1(a) because he has zero criminal history points. *See* PSI ¶¶ 145–46. Setting aside the irony that the defendant has zero criminal history points when he fled United States prosecution for nearly seven years, over three of which he served in a Cuban prison

6

for money laundering, that Guidelines adjustment creates an unwarranted disparity. The adjustment lowered the defendant's Guidelines from 41–51 months to the current range of 33–41 months based on 2023 amendments to the Sentencing Guidelines that were not in effect when the defendant was indicted in 2016. By 2016, the defendant had already fled to Cuba (before eventually moving to Mexico in 2022). In other words, had the defendant not spent seven years evading prosecution in the United States, had he "been sentenced years earlier for the same conspiracy," he would have faced a higher Guidelines range with no additional credit for having zero criminal history points. *See United States v. Adeniran*, No. 21-10609, 2022 WL 443819, at *4 (11th Cir. Feb. 14, 2022) (affirming a sentence toward the high end of the Guidelines for a defendant who "had been a fugitive for over a decade" when the Guidelines were lower based on the Government's inability "to establish a higher loss amount . . . due to the passage of time"). The Court should not reward fugitive behavior. It should reject the defendant's invitation to sentence him substantially below the current Guidelines range, which is already much lower than it would have been back in 2016 when he was indicted.

Second, the Court should consider the sentences already imposed on similarly situated defendants in this same conspiracy who were never fugitives from prosecution. Co-defendant Erick Rios was a patient recruiter for various pharmacies and the legal owner of RX Solutions, PSI ¶¶ 35, 91, 118, just as this defendant was a legal owner for another pharmacy and facilitated payments to patient recruiters at several other pharmacies. Rios caused approximately $2.4 million in loss to Medicare, PSI ¶ 118, an amount comparable to this defendant's $1.9 million loss that he caused. After Rios quickly accepted responsibility for his conduct without fleeing the country, he was sentenced to 36 months' imprisonment. *See* PSI ¶¶ 105, 118; DE 376. Co-defendant Jorge Sanchez played a very similar recruitment role to Rios, only he was accountable for a higher loss of $3.3 million. PSI ¶¶ 36, 89, 116. Sanchez was sentenced to 41 months' imprisonment. DE

7

373. While Rios and Sanchez were charged in the kickbacks conspiracy and this defendant was not, that was only because they directly paid kickbacks to patients. This defendant had an even higher role in the offense, obtaining and distributing the cash to the various patient recruiters like Rios and Sanchez. PSI ¶¶ 54–57. That role was harder to prove back in 2016, hence why the defendant was not charged initially in the kickbacks conspiracy, before so many patient recruiters were arrested and explained that this defendant is one of the coconspirators who paid them the money that they used to pay the patients, which helped sustain the fraudulent Medicare claims. The Court should take that important role into account and recognize that the patient recruiters could not do their job without coconspirators like the defendant.

### III.   CONCLUSION

For the foregoing reasons, the United States recommends that a high-end sentence of 41 months is necessary for this defendant in consideration of the various Section 3553(a) factor.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   */s/ Joseph Egozi*
JOSEPH EGOZI
Assistant United States Attorney
Court ID No. A5502707
99 Northeast 4th Street
Miami, FL 33132-2111
Tel: (305) 961-9050
Joseph.Egozi@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed with the Court and delivered to counsel of record using CM/ECF this 23rd day of March 2024.

/s/ *Joseph Egozi*
JOSEPH EGOZI
Assistant United States Attorney